# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE APPLICATION OF CAROLINA ANDRAUS LANE<br><br>REQUEST FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782. | Civil Action No. |

## DECLARATION OF CAROLINA ANDRAUS LANE IN SUPPORT OF *EX PARTE* APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782

I, Carolina Andraus Lane declare that the following is true and correct to the best of my knowledge and belief under penalties of perjury under 28 U.S.C § 1746:

1. I am a petitioner in this proceeding, and I am respectfully submitting this declaration in support of my application for an order from this Court granting discovery pursuant to 28 U.S.C. § 1782 (the "Application") authorizing my attorney to issue subpoenas for documents and depositions.

2. I am a plaintiff in two pending lawsuits in lawsuit pending in the Civil Court of the Central Judicial District of the Capital of the State of Sao Paulo bearing an index number 1033728-74.2021.8.26.0100. against my former husband Gilberto Miranda Batista ("Batista")

3. The aim of the lawsuits is to prove the following claims: (a) to recognize the existence and activity of a de-facto company and partnership-in-fact between the myself and Batista; (b) confirm of the partnership dissolution and distribution of assets; and (d) for accounting.

**Background**

4. I am a citizen of Brazil.

5. I graduated inn June 1996 from Fundação Getúlio Vargas with a degree in Finance. In 2017 I obtained an Owner President Management OPM degree, after attending several other

1

shorter programs in Real Estate Development from Harvard Business School, and in 2013 I completed a program in both Leadership & Family Wealth Management from Columbia University.

6. ~~For~~ 10 years before forming a business with my ex-husband – Batista, I was working for Bank of America and Bank Boston for almost a decade. My first role was as financial analyst for Large Corporate and later as Associate Manager to some of the largest companies in the country, where I worked in corporate finance, risk analysis, approval of structured deals, follow-up of mergers and acquisitions, company restructuring, and financial projections, as well as commercial relationship alongside an account Director.

**Business Venture**

7. Between 2004 and 2016 I was a business partner with my former husband Gilberto Miranda Batista, to whom I was married from 2007 to 2016. With joint efforts we developed numerous joint ventures, but for the purpose of this Application, I would like to focus on two.

8. First one was a development of a new container port terminal in Santos Brazil, and second was a development of a gas pipeline from the Urucu gas field to the city of Manaus in Brazil.

*Port of Santos*

9. In 2004, I gave up my career in corporate finance to pursue business opportunity. Me and Batista began researching an opportunity for creation and development of a port terminal in Santos, Brazil ("Port Project").

10. Between 2004 and 2007 I made over thirty international trips in furtherance of the Port Project. The purpose of those trips was firstly communications and presentations to potential buyers, which after many hours of meetings and research, until I successfully introduced the owners of MSC Group, through a personal contact. Subsequently, the trips continued and I

with my former husband identified a potentially viable area in the Port of Santos for development of a new port terminal, which was structured into a project aiming to support the buyers special needs in terms of volume, retro-area and operations. Subsequently, the Port Project was approved by CODESP – Companhia Docas do Estado de São Paulo (Dock Company of the State of Sao Paulo) and by the National Waterway Transport Agency, and numerous environmental agencies.

11. Since I had both an experience of working on large business conglomerates and I can speak seven languages, negotiations and presentations fell to me mostly.

12. Between 2004 and 2006 me and my former husband travelled to Paris three times and to Marseilles twice. The purpose of those travels was to meet with Jacques Saade (French Lebanese owner of the third largest container transport company in the world, MCA CGM) to discuss the viability of the Port Project.

13. In addition to company structuring, I was responsible for presentation of business opportunities to potential investors.

14. In 2006 me and Batista attended a meeting with Mediterranean Shipping Company S.A. ("MSC"). This meeting was facilitated by Marc Demane – my personal friend and friend of MSC main shareholder, the Aponte Family. I held several presentations on the Port Project, which included long discussions on the potential of the business, the different land that should be acquired to make the terminal viable in terms of size, licensure requirements for the terminal to start construction and to allow a future operation, as well as important environmental remediation issues.

15. After MSC performed their due diligence and we were able to structure the project and acquire the different pieces of land to form the new terminal, and managed to approve initial governmental license, a Call Option Agreement (See **Exhibit 1)** was signed where me and

3

my former husband were sellers of 50% of the shares through KKW VENTURE CAPITAL LLC ("KKW") and Terminal Investment Limited ("TIL") as a buyer – on information and belief a fully owned subsidiary of MSC.

16. KKW is a shell company that was part of my former husband net of companies all over the world. KKW was used to sell the Port Project, receive the proceeds of sale outside the territory at the banking system of Brazil, and to be able to maintain the resources in bank accounts outside of Brazil[1]. At the time, my husband assured me that KKW was used to facilitate the sale of the business, which was mine as well as his.

17. The Call Option Agreement was for a 50% stake in Europe Brasil Terminal Portuário Ltd. that KKW owned. On December 27, 2006 Terminal Investment Limited paid $27 million USD in consideration of the Call Option (See **Exhibit 2**).

18. On January 29, 2007 the call option from the Call Option Agreement was exercised and 50% of the shares of the Port Project was sold for $25 million. Subsequently, as more licenses were confirmed for the incorporation and construction of the project, the remaining 50% shares in the project were sold in June 2007 for $175 million, which was paid $75 million in June 21st 2007 and $75 million in October 24th 2007, and a final $28,916,240 paid in August 19th 2010 after the final documentation to start building the project was achieved. (See **Exhibit 3** – Letters to KKW evidencing the exercise of the call option)

19. Call Option Agreement payments were made to pre-existing accounts at SAFRA NATIONAL BANK in New York, and later, in part, with EFG Bank in Switzerland and Deutsche Bank New York. All accounts belonged to KKW. Proceeds from these two accounts, were further transferred to Deutsche Bank, Morgan Stanley and Royal Bank of

---

[1] Gilberto Miranda Batista was a senator for the Brazilian state of Amazon, so there was always a great emphasis to keep a low profile with his financial operations. He tried to keep his financial structure as much outside of Brazil as possible.

4

Canada in an effort to reduce the risk of keeping all the money in one single institution.

**Manausgás Project**

20. After me and my former husband realized the profits from the sale of the Port Project, we invested a portion of those profits into building part of a 650-kilometer gas pipeline. A pipeline would run from Urucu natural gas exploration site operated by Petrobras in the middle of the Amazon Jungle, connecting to the Brazilian Tax Free Industrial Zone located in Manaus, capital of the State of Amazon, Brazil ("Manausgás Project"), with the purpose of distribution the natural gas in a "take-or-pay" contract with Petrobras.

21. Manausgás Project was mas made possible through capital injections from profits realized through sale of the Port Project, and through my reinvestment of the proceeds of the proceeds from the Port Project.

22. Me and Batista a decision to use our common resources for the investment as follows: (i) KWK Venture Capital LLC - Capital Payment in Manausgás, December 31, 2007; (ii) further capitalization payments to Manausgás by KWK Venture Capital LLC - Capital Payment in Manausgás made on March 19, 2008, July 31, 2008, and August 25, 2008. Total capitalization followed until later at 2013 reached close to $57 million USD, all sent formally through Brazilian Central Bank.

23. The ownership structure of the Manausgás Project was as follows:

| Entity: | Percentage of Ownership: |
|---|---|
| CIGAS[2] | 17% |
| CS PARTICIPAÇÕES LTDA[3] | 41.5% |
| KWK VENTURE CAPITAL LLC[4] | 41.5% |

---

[2] Companhia de Gás do Amazonas – a company belonging to the Amazonas State, and a exclusive holder of rights to explore and distribute gas in the Amazonas State.
[3] A company owned by Carlo Suarez – a Spanish investor
[4] A company I believed at a time was jointly owned by me and my husband

5

24. The following structure was incorporated under the name MANAUSGÁS S.A., (a Brazilian corporation organized on 2000, which got its first license to start building and operating in 2006 when the capitalization/investments started.

25. Subsequently, profits realize through Manausgás Project, now under the umbrella of Cigás. were distributed to Thames CV (yet another shell company). My former partner and former husband to this day is the only one who benefits from this arrangement.

26. On information and belief, to date, Manausgás Project yielded significant profit. As I mentioned earlier, it is estimated to be generating approximately $50 million a year in annual dividend distribution.

**Ownership Structure**

27. After the sale of Port Project was concluded, me and Batista decided to organize a corporate structure and make me the co-owner of the resources originating from the business. We decided, for reasons of ease and cost, that my former husband's existing structure would be used, and that we would share the profits and operations as equals. This of course included the profits from the sale of Port Project, which by that time was concluded.

28. In October 2007, me and my former husband travelled to New York, where with the help of the law firm of Fox Horan & Camerini LLP ("Fox"), specifically Donald Fox, I was added as a 1/3 beneficiary of the pre-existing Admiral Trust on the 23rd day of October, the day before the $75,000,000 payment was received by KKW, making my ownership formal under the existing structure. On information and belief, Admiral Trust is a structure under which my former husband maintained his previous assets.

29. My share of the proceeds from the sale of Project Port made me entitled to 1/3 share in the

Admiral Trust.

30. Around this time, I began managing all our family as well as business investments, including Manausgás Project, and managing our investment position in the New York Stock Exchange with the proceeds of the sale of the Port Project.

31. My management responsibilities included managing of investments as well as expenses, both personal and business. In Brazil I accomplished this through using the company BRAEMP Brasil Empreendimentos e Participation. Expenses outside of Brazil were paid by Mr. Rafael Urquia from the office of Fox, Horan & Camerini LLP, including the American Express Centurion (See **Exhibit 4** – American Express Centurion credit card statements sent to Fox, Horan & Camerini LLP)

32. Additionally, I maintained relationships with banks on behalf of the companies of for mine and Batista's business structure. This structure included: Admiral Trust, KKW Venture Capital Investment Co., KKW Venture Capital LLC, Deanston Worldwide Limited, Eagle Technologies, LLC, Aglais Investment Company, and many others, and later on Spetses Trust, Spetses Executive Holding, Acacia Trust and Acacia Executive Holding as the structure was changed throughout the years.

33. In December 2008, I began restructuring and managing risk of our mutual family and business assets by opening accounts in Deutsche Bank through the banker Eva Pace, Credit Suisse through Antonio Giorgetti, Morgan Stanley through banker Walter Alves, and RBC Royal Bank of Canada through banker Dirceu de Magalhães, EFG Bank through Cesar Nascimento, and Bear Sterns - Citigroup through Alberto Mariaca.

34. As I mentioned earlier, the joint business partnership formed between me and my former husband was structured through the Admiral Trust in 2007. Admiral Trust, in 2010 was restructured into Spetses Trust, and then Acacia Trust in 2014. I presided over the Protective

Committee in Assembly, deliberating and approving the transfer of all the assets of the Admiral Trust initially, and later on from the Spetses Trust to the Acacia Trust, also of its co-ownership. (See **Exhibit 5**) I was also the beneficiary of 1/3 beneficiary of Acacia Trust (See **Exhibit 6** – I only have a portion of document in my possession)

**Representation by Fox Horan & Camerini LLP.**

35. Fox Horan & Camerini LLP, began representing me in 2006. The firm had been representing my former husband for around 30 years at this point.

36. Every time the trust structure was changed, all the beneficiary owners approved and signed the changes together.

37. From 2006 to 2019 Fox were acting as both my attorneys and trustees. (See **Exhibit 6** – various invoices from Fox Horan & Camerini LLP for the Trusts; **Exhibit 7 –** Email from me to Rafael Urquia II requesting clarification on ownership structure) Besides representing me in trusts, Fox signed for all the bank orders and bank transfers.

38. Most transactions were carried out by Rafael Urquia II using different powers of attorney. In some instances, Mr Urquia acted as a director of certain entities.

39. Fox Horan & Camerini LLP always advised me on the company structuring, especially when it came to international business transaction. For example, on May 30, 2007, I met with Donald Fox – a named partner at Fox Horan & Camerini, so he could advise me on proper structuring on the sale of Port Project

40. After me and my former husband parted ways, Fox continued to represent me until 2019.

41. In 2021 I requested access to certain documents (See **Exhibit 9** – Copy of the email to Fox), but the email went unanswered.

## CONCLUSION

42. To summarize it was through my contribution and efforts that both the Port Project and Manausgás Project came to fruition. Especially in terms of the Port Project I was the one who sought investors; nominated the buyer; carried out the negotiations in person, by phone calls, messages, emails, virtual and face-to-face meetings abroad; participated in the preparation of contracts; closed the transaction together with the Batista; celebrated the closing of the deal; managed the entire procedure for receiving the amounts, including the financial institutions and the purchasing company.

43. For reasons of above, I respectfully request this Honorable Court to issue an order granting me leave to issue subpoenas for production of both testimonial and documentary evidence to those entities that are attached to my attorney's proposed subpoenas.

Dated: February 03, 2022

_____
Carolina Andraus Lane